Okay, who's up first for the appellant? Ms. Agatstein? Good morning, Your Honors. Jesse Agatstein, Federal Defenders of San Diego, on behalf of Mr. Elias. I intend to reserve at least two of my ten minutes for rebuttal. I'll watch the clock. Thank you. So at this trial, there was a confrontation clause error of introducing a deported witnesses deposition despite indications that he was available and the problem was really dealing with his attorney's quote, inability to counsel, but you have very little time. And so if you don't mind, I apologize for the interruption. But it does seem to me that Mr. Cruz Gonzalez's lawyer was the cause of the problem. And I don't understand why his mistakes or bad faith or whatever one wants to call it, are attributable to the government and to whether its efforts were sufficient. Is there any indication that the government knew at the outset that Mr. Frank was going to become a problem? Not at the outset, Your Honor. However, at the point, he filed the motion to quash the subpoena. That is where at that point, what could the government do to undeport the witness? So at that point, what the government could have done was clarify whether the Mr. Frank had conveyed the information about trial and had conveyed the information to his client about how to appear for trial. How does the government do that? Ask the court to inquire Mr. Frank in court, have you conveyed the information? That would not be a problem with attorney client privilege. Could your client have made that request? Yes. And he asked at one ER. And what did the court do? The court said, declined. My client asked the government to bring Mr. Frank to court. And just to clarify, did the subpoena with the new trial date go to your client? Is the problem a logistical one that you have conveyed all the information? My client asked the government to do that. Why would the answer actually matter to what the government did rather than what the court decided to do? In other words, if Mr. Frank was a bad actor, I don't know if he was, but let's assume that he was devious and he didn't convey the information or let's assume that he did and his client said, heck no, I'm not coming back. What difference does that make in terms of whether the government acted in good faith and the government did what it had to do? Because it is the government's burden to prove that the witness is unavailable. And it's not enough to prove that the witness's attorney is confused or not fulfilling his obligation. It must prove that the witness is unavailable. So given that it's the government's burden to put forth information on the record to show a witness's unavailability. And here the government had several opportunities to do that and chose not to. That is the major issue. I don't really understand. I mean, there doesn't seem to be a dispute that the witness was no longer in the United States. That's correct. And so you're telling me the government had several opportunities to put what on the record? To ensure that the witness knew of the new trial date and how to get to trial. That's really it. But is there anything, I mean, did the government know his whereabouts? Did the government have an opportunity to communicate directly with him? Well, so it did at the deposition, right? At that point, it had the opportunity to learn where he lived. It learned he lived in Tijuana, right across the border from where trial was taking place. And then the government also had the opportunity. There was the opportunity before. I mean, presumably, your client's counsel could have asked the same questions. My question is really, is there any evidence the government knew had direct communications with the witness at the time that mattered, which is after the witness is no longer in the country, and now the government's trying to get him back? Or is there evidence that this was contrived, that the government for some reason didn't want to get him back, so set it up as deliberately ignorant and so forth? I can construct a scenario, but in fact, I just don't see anything in the record that tells us that the government wasn't proceeding the way it was supposed to proceed. So I think two things. One, there's no argument about good faith here. This is not a contrived kind of argument. The question is really about, did the government take reasonable efforts that were available to it to get the witness to come to court? And there's no dispute. On that, I wanted to follow up on Judge Clifton's question, which was about direct contact. If he was represented, presumably, the government could not contact him directly. So that avenue would not be certainly required and maybe not even available. So that takes me sort of back to the beginning, which is what do you do if you're the government and you act in good faith, but the lawyer will not cooperate? I'm not sure what more they can do, regardless of the reason why the lawyer is not cooperating or is not making the person available. I'm not sure what they could have done. So here, what they did is they asked the lawyer one question they put on the record. Does your client intend to come to court? There are other questions they could have asked the attorney and put on the record. Does he know what day court is? Does he know how to get to court? Does he know that we will pay his fees? Well, I guess the problem is that these demands for these additional questions are at the end of a long course of dealing where the government, by all lights, seemed to have proceeded by the book in terms of ex ante, before deporting him, the deposition, opposing the motion to quash, continually checking in and asking questions throughout. And so I guess the concern is in terms of a rule, a constitutional rule, there's always another question the government can ask if the witness's lawyer is being obstructive. But that can't be the rule because those questions will always be out there as long as the witness isn't in court. So two answers to that, Your Honor. First is there is a higher bar the government needs to meet when it is responsible for its own witness being unavailable, right? But two more directly to your point. Here, the government only asked one question. This is not does your client intend to come to court, which honestly, as a defense attorney, is kind of designed for an attorney to privilege. But there are questions that the government could have asked that were reasonable. We are not asking the government to drive down to Tijuana with a crew of agents to look for this. This is on a question of reasonableness, asking the attorney a few questions on the record or placing more information on the record that this person knew the date and time of court and just was choosing not to come rather than not knowing. Can I ask you a question about the hearsay issue? Yes, of course. What is the truth of the matter asserted on the form? Yes. Whose phone was whose? This phone was Mr. Elias's. This phone was Ms. Monroy's. So ownership. But why isn't the error harmless when there's evidence of the chain of custody and there are selfies on these phones that there's other evidence about the ownership? Yeah. Why isn't that? Assuming it's error, which to me, it was hearsay, but I don't see where the prejudice lies. So it's served as the most obvious foundation connecting up the phones to individual people and the only foundation that went back to the jury room. So did you object to it going back to the jury room? No, because we objected to its introduction in the first place. And so like all other documents, our objection was overruled and thus it went back to the jury room. I'm happy to reserve the remainder of my time unless there are any further questions. My colleagues have any additional questions? We'll give you an additional. We'll give you the full two minutes. Thank you. Good morning, Your Honors. May it please the court. Mark Rahe for the United States. Your Honors, there was no confrontation clause violation in this case. As the court is aware, the question of unavailability requires a good faith effort by the government in the extent of the efforts that are required are a question of reasonableness. Counsel, I have a question for you as well on this issue. It seems to me that there may have been a tactical or strategic error on the part of the government in allowing this person to leave the country rather than to continue to be held in custody. And this may be sort of irrelevant, but how realistic is it to expect a person to return in these circumstances to testify? Is this something that happens regularly or never or? Your Honor, my understanding is that it does happen on occasion, but that it's also, I mean, I really don't have those numbers at hand. But all I do know is that for years, in fact, you know, there are no published cases on point, but the brief, when there is an appointment of counsel, all those cases say you continue to communicate with counsel, you give at the time of the deposition, you give a subpoena, you give a promise to pay costs and you give a parole letter. Yeah, that has to do with, again, with the government's efforts, but I guess I, maybe it's not relevant, but it's certainly a curiosity to me how realistic it is, even when the government does go through all those steps to actually expect someone to return. And I wish I had that anecdotal information for your honor. Well, it's not just, I guess, anecdotal, right? If the government does, you know, walks through all these steps, you know, seems very by the book, appears to be making these good faith efforts, but also knows that only 5% of material witnesses that are removed ever make it back. It just seems like, as Judge Graber seems to be suggesting, it seems like that should matter to the analysis, since it's the government that's making that decision. Right. But, you know, that's again, that kind of overall statistical information is not at my disposal. What I do know is that it's interesting. You look at a case, the defense puts heavy reliance on a case called Burden out of the D.C. Circuit. At page 688 of that opinion, all of the defects in that case are not present here. And in there, you know, before the deportation, at the end of the deposition, in fact, in Burnett says, before his deportation, the government did not give the witness there a or confirm his contact information. Here, as the deposition transcript points out, it was at least a two or three page colloquy. The prosecutor made sure that the material witness had the lawyer's information, that the lawyer had his contact information derived or listed and expressed promise to appear. And, you know, if the defense says like he just lives in Tijuana, there's no it's not objectively unreasonable for the prosecutors at that time to think that he would come back. And that's all that the law requires. But again, process work. I mean, take the witness decides he'd rather be back in Tijuana than remain in detention here. He's given permission to come back for the purpose of testifying. Is he going to be in detention then? I mean, if that's how it's set up. Hard, hard, perhaps to conclude that we could really believe he's going to come back if the whole point of going in the first place is to avoid detention. If he comes back, he's going to be held at the detention center. Do we know how that process works? Yeah, actually, that I can answer, Your Honor, because by the time of trial, he gets a parole letter. And that is to the authorities at the port of entry. It says, let this person in for this purpose to not take him into custody. And I think the expectation at least for the period of time for the parole letter, he can wander around and do his business. He can. But again, he's expected to come to court. And, you know, that's why I mean, but the point being, it's not like there's going to be agents there and he's going to have to go through this. It's not like guaranteeing to go back into jail if you come back to this country. Not at all. Not at all. Is the government, I guess, to flip the my question on its head, is the government have experience of anyone coming back and testifying with this arrangement? I again, I've been in appeals for the last 20 years. I haven't tried cases. What I have heard that, yes, there have been such cases. I, unfortunately, don't have those statistics at my fingertips. But all I know is that, you know, and it's interesting because even the at the moot court for this, the trial lawyer said, you know, I didn't know what to do. This has never happened before. This procedure, when you get a material witness, you have the deposition, they get their own counsel. Even the judge, you can see the frustration of the district court below. And she knew that this material witness counsel had experience. This is the way that the system goes. They filed that motion under 3144 claiming excessive hardship from, you know, extended pretrial detention. We rely on their representations. You have this deposition where all lawyers for all defendants had a full opportunity to cross examine. And again, I would just say, you know, again, I wish I had those overall statistics, but let's look at the controlling law again. There is no black judge has experience. You've looked at the record more thoroughly, I suspect, than I have. Did she ever comment on her experience or how surprised she was at how it unfolded? She did. To my understanding, she did not comment on her experience. But by I think it was 11 days before trial at that hearing, which was after the hearing on the motion to quash, I think she does say at one point she doesn't think he's coming back because by that point, you know, the government had given her, you know, she knew. I know at one point defense counsel made it sound like, you know, we just needed to ask another question or so. This district court was fully aware in our opposition to the motion to quash. We attached the transcript of the deposition. When she denied the motion to quash, she's reading through that two page colloquy. She tells the lawyer, you know, and he confirmed that he had, I think, volume five of the excerpt of record, pages 865 and 856. He acknowledged receiving updated, you know, the subpoena, the parole letter and the promise to pay the costs. You know, at some point, even under the I know Judge Graber pointed it out. When somebody is represented, that's under Rule 4.2 of the ABA rules. You know, the government is entitled to rely on that. That's the system. And even there's a case United States versus Rodriguez. We cited in our briefs. It was never acknowledged in either one of the defendants briefs whether witnesses represented by counsel bears on whether it's ethically appropriate for a prosecutor to attempt to contact him or her directly here. There was no indication at the outset that this defense lawyer would end up playing games. And as we pointed out, you know, the government, what else could we do? We can't force this, you know, this material witness to come to court. It's not our position to interfere in an attorney client relationship with the material witness in his counsel. This was the government would submit the rule of reasonableness that that is satisfied on the harmless error analysis for the Confrontation Clause. I think the government points to Agent Boves testimony of how they identified Mr. Cruz Gonzalez in the car. Is that hearsay? And was it objected to? I don't believe that's hearsay, you know, because that's a drug that was definitely not objected to. And, you know, not only did he testify to that, you also have, as we pointed out, the circumstances of the arrest. This was a cold, rainy January morning. The driver of that car is warm and dry. All seven persons in the back, one of whom included this material witness, is cold and shivering. And in Peña Gutierrez, this court said that that kind of information also counts as strong circumstantial evidence of alienage because a citizen of the United States or somebody else who legally had the ability to enter the country obviously wouldn't go through the contortions that this material witness did to get back in the country. So why wouldn't the government's argument about on hearsay, on the hearsay, now the defense's hearsay claim that it's a public record and swallow most of the investigative and documents? We're talking about the second issue now. Yeah. Yes, you know, it is unfortunate that that was admitted as a business record. Our position is that this is a clear non-hearsay purpose. This is a chain of custody issue. All those two lab analysts testified was they copied the name that was on the bag in which the phone got to them. But I think also as one of your honors pointed out, even assuming that was error, there was strong evidence, independent evidence of the ownership. You have the selfies in the phone. You have every out, well not every, a lot of outgoing messages from Mr. Elias Ramirez's phone where he says, this is Chino. Every single cooperating witness at trial testified without dispute that that was his nickname. You have for Ms. Monroy a photograph of a government identification. And the last thing I'd say about that is in a closing argument, not once did the government take those worksheets up and say, look, ladies and gentlemen, this is the proof of why it's an ownership. To the contrary, in that closing argument, the prosecutor only referred to the evidence that I just mentioned. And so unless the court has further questions, and I hope I did not prejudice my colleagues' time. No, we'll keep you on separate clocks. Any other questions? Okay. Thank you, Mr. Rahy. All right. So three points. Judge Graber, to your question about how realistic it is to deport someone to Mexico and expect them to come back, co-counsel and I cannot remember a trial we've seen in which that has happened. It's really only whether a material witness is released into the country that they come back to testify at trial that we've seen in our experience. It's very unusual. The second point on the harmless error question on the confrontation clause, the first issue, I do think it was hearsay, but it wasn't objected to. But more importantly, direct testimony of citizenship, I am not a citizen of the United States, is just much more powerful evidence than someone being rainy in San Diego, as unusual as that is. And I'd point this court to its case, Bustamante, in which a testimonial statement about someone's citizenship was held to be not harmless beyond a reasonable doubt, even though there were marriage records, school records. And the point is really saying I'm not a citizen is very hard to prove harmless beyond a reasonable doubt under the constitutional standard, particularly here when the agent who testified to the probably hearsay said was not fluent in Spanish. He could not remember whether Mr. Cruz was in the car at first. It was much shakier testimony. And then just on the third point, I'd emphasize to this court that the choices available to the government in the situation are never just to detain someone or deport them. As this court explained in Yeada, there are many options available to release a material witness into the United States with higher, more restrictive conditions, such that it's not put in this admittedly pretty unusual situation with an uncooperative attorney. Thank you. Thank you, Ms. Agatstein. Mr. Bertram. Your Honor, good morning, Gary Bertram. On behalf of appellant Claudia Monroy, I would like to focus on the guilt concession issue, which is in the opening brief, starting with opening statement and all the way. Excuse me. Could I ask you to speak closer to the microphone? I'm having trouble hearing you. Yes, Your Honor. Is that better? Thank you. Yes. Thank you so much. You're welcome. Starting with opening statement and also including closing statement, defense counsel conceded guilt, conceded Ms. Monroy's guilt as to the alien transportation counts in this case. That was counts two, six, and eight. We know from the trial record why defense counsel did this. Essentially two reasons. Number one, the counts three and five, the substantive bringing in counts were the most serious counts in the case because they each carried a three-year mandatory minimum sentence. And also, the bringing in counts were certainly more defensible than the alien transportation counts. These sorts of guilt concessions can be legitimate, tactical, smart things to do in a trial. Conceding guilt on less serious counts or less defensible counts, it may be a good way to see that often in capital cases. But the concession, and the cases all say this, the concession needs to be sensible. It needs to be rational. There has to be a reason to make this concession. But we don't know what the reason might be because we're at a stage of the case where that question is difficult to explore, which gets to the broad question. Is this a challenge that we can properly take up at this stage? That was the government's threshold argument. And it's something we get all the time. Effective assistance of counsel usually comes up in the context of habeas post-conviction review because then you can actually dig in and find out from the attorney what the reason was and so forth. And we can't do any of that now. I agree, Your Honor, that these claims are typically brought on collateral review, 2255. And there's typically or can be further record development at that point, including potentially an evidentiary hearing where the attorney testifies as to the what and the why. But I think given the totality of the trial record in this case with an experienced defense counsel who clearly understood the ramifications of counts three and five and focused his arguments on trying to beat those counts, I think we have enough in the record in this case to understand why counsel acted as he did with respect to conceding on the transport counts and trying to gain acquittals on counts one, three, and five. Do we even know whether the client consented or, you know, strategized around this, which would also matter to the analysis? It would matter. No, we don't have that information before. One way or the other. Correct. Correct. And so if the court... Why don't we take it up now? I mean, you just observed that it's usually collateral. It's a rare case we can take it up on direct appeal. Just explain some of the reasons why we don't take it up on direct appeal. So why should we hear? Because that's not the basis of our argument in this appeal. We're not saying that there was an issue concerning client consultation or client consent to the guilt concession strategy employed by defense counsel. We're saying that the guilt concession strategy employed by defense counsel was just irrational based upon the nature of this case, the proof that was introduced at trial, and the different counts that... So even if we don't know from the attorney what the reason was, and even if we don't know from the client as to whether all of this was explained, I mean, again, you're asking us to proceed with a veil of ignorance as to key questions. Why? Because Ms. Monroy is facing removal to El Salvador. Ms. Monroy is not going to be able to file a Pro Se 2255 alleging ineffective assistance of counsel because, number one, if she was not advised as to this, if she did not consent, I don't know what the answer to that question is. But isn't that also going to be true even if those counts are removed, there's an additional count, and she'd be in the same boat as far as her ability to file a 2255. Is your honor mentioning count one in the case? I'm referring to the your second argument about the conspiracy count. That's right. So by the time this case got to closing argument, there were four counts left. There were counts two, six, and eight, which were the substantive and conspiracy to transport counts. And then there was count one, which was the conspiracy to bring in count. And so after counts three and five were dismissed before closing argument pursuant to the Rule 29 motion, defense counsel turned his attention to count one, which was the conspiracy to bring in aliens account. And as I set forth in my brief, that count was no more serious than the other three counts in terms of penalty. That count was no more serious than the other three counts in terms of collateral consequences. And so we have a situation where counsel is arguing for acquittal on count one at closing argument. The other three counts have already been conceded, and an acquittal on count one would have done absolutely nothing for Ms. Monroy at that point. It wouldn't have changed her sentence, wouldn't have changed her. Well, I guess my question is sort of the opposite of that. And it is, if, even if counsel was ineffective on the other counts, why wouldn't this remaining count still carry all the same consequences? It would have the same consequences, the same guidelines, the same collateral effects for immigration. But the point I'm trying to make, and the point I tried to make in my brief, is that these guilt concession strategies and these guilt concession arrangements by a defense attorney have to be rational. You can't just willy-nilly concede guilt on certain counts because you might want to argue for a different count. There has to be a reason. There has to be a potential benefit to the defendant. And the problem with this case is by the time this got to the end of the case and closing argument and then went to the jury, there was zero potential benefit to Ms. Monroy with the counts that remained. Mr. Bertram, can I ask you a kind of a technical question about Joinder? The government objects, and I don't think we've heard your response to that objection in the briefs. With respect to? Joining Mr. Elias Ramirez's appeal. Yeah, I would just say that it's co-defendants in the same case. But not consolidated as the rules kind of contemplate. That is true, Your Honor. I don't have a response other than just co-defendants in the same case. I didn't want to brief the exact same thing and have the court read that twice. And so that's my response to that question. Okay. Do you want to reserve your remaining time for rebuttal? Yes, please. Thank you very much. Thank you. Ms. Alexiades? Good morning, Your Honors, and may it please the court. Isabel Alexiades on behalf of the United States. So I'll focus on the ineffective assistance claim, but if you have any questions on the sufficiency claim, happy to answer those as well. This claim is not properly before this court on direct appeal. As Judge Clifton pointed out, we don't know why defense framed the case as he did, and this is not the extraordinary case that is appropriate for review on direct appeal. As my friend acknowledged, concessions are not per se unreasonable. I'm sorry, can we start the clock? Thanks. Thank you. Yeah. So as my friend acknowledged, concessions are not per se unreasonable. Depends on the circumstances of the case. And here we don't have a full picture of the determine whether his framing of the case was appropriate. Can you think of a reason? It's odd because it's sort of like I'm looking at a mirror image, and we got the same problem. We can fairly say, and you heard us say to your colleague, so what difference is it going to make? And we wind up coming back to you and say, so what possible benefit could there be to this strategy? We're operating in the dark, but it is true that once removed, and as I understand, this is the case in which defendant has served time, so all that's left is the supervised release. But if you're no longer in this country, that really doesn't count for anything. You're not really in a position to file a collateral challenge. So I sort of understand why they're trying to push it forward now, so I start to speculate. Can you think of a reason why defense counsel might want to do that? Sure. So I think evaluating the case as a whole, we have to consider what defense counsel was doing from the outset. And at the outset, the two counts that carried a mandatory minimum were on the table. So I think it was perfectly reasonable first in opening for defense counsel to use the opening statement for its stated purpose, which is to preview what the evidence will show, soften the ground for the jury, and take the sting out of what was pretty overwhelming evidence against Ms. Monroy. It's a tough defense. That's part of the context. But does it help against the circumstances which present a tough defense to say, okay, yeah, she's guilty? I think that it can help, and I think that the Ninth Circuit's case law has established that, that it can be used to boost credibility and focus the juror's attention on the real battlegrounds in the case. To finish answering your question, I think the second part is, so what was the purpose of continuing with this strategy after the Rule 29 motion had been granted and the mandatory minimum counts were off the table? And I think at that point, it still makes sense to continue with the same strategy and the same framing of the case because the defense counsel reasonably wanted to present a consistent narrative from opening to closing. It wouldn't have made sense to build up credibility in opening and then squander that after the case had been presented by switching strategy midstream. I also think that while my friend makes the point that the maximum penalty for the bringing in conspiracy was not greater than the transportation counts and it might not have changed Ms. Monroy's guidelines range, I think it's plausible that it could have affected where the judge chose to end up within the guidelines range Ms. Monroy received amid... They did get different sentences, although I suspect that may have more to do with the factual circumstances and rule, but it is true there was a difference. Exactly. So I think that, first, our threshold position is that we don't have enough evidence in the record here to decide this claim on direct appeal. But should the court wish to reach the merits, we don't think defense counsel's performance was deficient. Taking the inferences that Ms. Monroy presents in her brief, this was a reasonable strategy aimed at boosting credibility with the jurors and focusing on the more defensible counts. But even if it were deficient, there's no way it could have prejudiced Ms. Monroy, given the overwhelming evidence against her on the transportation counts. Well, I guess, I mean, there is a line of cases in McCoy that would say that if this were conceded without the client's consent, at least in some instances, that's kind of structural error. We don't look to questions of whether it was harmless or not. Yes, but as you pointed out, we don't have evidence in the record as to whether or not she objected or consented to this strategy. So that's something that would have to be in collateral proceedings. We don't know here whether that was an issue. And in a case like McCoy, that type of evidence was in the record. On the sufficiency count, the evidence easily supported a conviction for bringing in conspiracy under Jackson v. Virginia. Ms. Monroy was not a bystander or a one-time driver. She consistently coordinated pickups from the border, acted as a lookout, transported migrants for pay, and was trusted enough that her brother told the other members of their group that she would be, quote, left in charge should anything happen to him. There is no tension between the jury's conviction on that count and the court's grant of a Rule 29 motion on the separate offense of aiding and abetting the bringing in of two specific individuals. If the court has no further questions. We ask that the judgment be affirmed. No for me. Doesn't sound like we have any. Okay. We ask that the judgment be affirmed. Thank you. Thank you, Ms. Huxiades. Mr. Bertram. Thank you, Your Honor. Just a couple of points. Your Honor asks, you know, why continue with this after the Rule 29s had been granted? And the reason is because you can't unconcede guilt at that point. That's why it was important that defense counsel not concede guilt, starting with opening statement, given that it was clear there were going to be sufficiency and proof issues with respect to these bringing in counts. And so, once that was conceded in opening statement, there was no U-turn. There was no going back. That was something that led to the very bizarre situation where there were four counts in closing argument that were at issue, and guilt was conceded as the three of the four counts. And so, that's why that happened. With respect to prejudice, clearly the government had sufficient evidence to show that perhaps Ms. Monroy conspired to transport people and also transported people. The one gentleman was in the back of her van, cold and wet. But the point I'm trying to make with this Court is that when you have a guilt concession scheme that overall is irrational and doesn't serve any purpose for the defendant, that should implicate chronic. Because we don't have a complete breakdown of challenging the government's case because counsel did challenge count one. But when the entire scheme just doesn't make sense, it doesn't aid the defendant, it doesn't serve any purpose for the overall defense, I would submit that in that unusual situation, which is what we have in this case, I would submit that that is a situation that would invoke the chronic automatic reversal rule, even though the defense counsel did argue against count one in closing argument. And unless the Court has any other questions, I'll submit on that. All right. Thank you, Mr. Burcham. Thank you, counsel. The case is submitted and we are in recess for the day.
judges: GRABER, CLIFTON, JOHNSTONE